UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MICHAL KUCHARSKI, Individually and on Behalf of All Others Similarly Situated,<br><br>                                   Plaintiff,<br><br>                    v.<br><br>DIDI GLOBAL INC. f/k/a XIAOJU KUAIZHI INC., WILL WEI CHENG, ALAN YUE ZHUO, JEAN QING LIU, STEPHEN JINGSHI ZHU, ZHIYI CHEN, MARTIN CHI PING LAU, KENTARO MATSUI, ADRIAN PERICA, and DANIEL YONG ZHANG,<br><br>                                   Defendants. | Case No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS<br><br>JURY TRIAL DEMANDED |

Michal Kucharski ("Plaintiff"), individually and on behalf of all others similarly situated, by and through Plaintiff's attorneys, alleges the following based upon the investigation of Plaintiff's counsel, except as to allegations specifically pertaining to Plaintiff, which are based upon personal knowledge. The investigation of counsel included, among other things, a review of the public filings made by DiDi Global Inc. f/k/a Xiaoju Kuaizhi Inc. ("DiDi" or the "Company") with the United States ("U.S.") Securities and Exchange Commission ("SEC"), press releases and media reports issued by the Company, news reports about the Company, and other publicly available information concerning DiDi, including, but not limited to, publicly available trading data relating to the price and trading volume of DiDi securities and analyst reports.

## NATURE OF THE ACTION

1.      This is a securities class action brought by Plaintiff under Sections 11 and 15 of the Securities Act of 1933 (the "Securities Act") and under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of persons and entities that purchased or

otherwise acquired publicly traded DiDi securities: (a) pursuant and/or traceable to the registration statement and prospectus (collectively, the "Registration Statement") issued in connection with the Company's June 2021 initial public offering (the "IPO" or the "Offering"); and/or (b) between June 30, 2021 and July 21, 2021, inclusive (the "Class Period").

2.      DiDi purports to be the world's largest mobility technology platform.  Its four key components are: shared mobility, auto solutions, electronic mobility, and autonomous driving. The Company claims to be the "go-to brand in China for shared mobility," offering a range of services including ride hailing, taxi hailing, chauffeur, hitch, and other forms of shared mobility services.

3.      On June 10, 2021, DiDi (then named Xiaoju Kuaizhi Inc.) filed a registration statement on Form F-1 with the SEC to register its Class A ordinary shares, which, collectively with subsequently filed amendments on Forms F-1/A and F-1MEF, a registration statement on Form F-6, and a June 30, 2021 prospectus on Form 424B4 (the "Prospectus"), forms part of the registration statement for the Company's IPO (the "Registration Statement").

4.      In the IPO and pursuant to the Registration Statement, including the Prospectus, the Company sold approximately 316,800,000 American Depositary Shares ("ADSs" or "shares") at a price of $14.00 per share, not including the underwriters' option to sell an additional 47,520,000 ADSs.  Four ADSs represent one Class A ordinary share.  The Company received proceeds of approximately $4,331.6 million from the Offering, net of underwriting discounts and commissions.  The proceeds from the IPO were purportedly to be used to invest in the Company's technology capabilities, grow its presence in certain international markets, introduce new products and expand existing offerings, and general corporate purposes.

5.      On July 2, 2021, multiple news outlets reported that the Cyberspace Administration of China ("CAC") had posted an announcement that the CAC had launched an investigation into DiDi to protect national security and the public interest.

6.      Also on July 2, 2021, DiDi issued a press release entitled "DiDi announces CyberSecurity Review in China," confirming that the Company was under investigation and stating that "pursuant to the announcement posted by the PRC's Cyberspace Administration Office on July 2, 2021, DiDi is subject to cybersecurity review by the authority."  The Company's press release also states "[d]uring the review, DiDi is required to suspend new user registration in China."

7.      On this news, the Company's share price fell $0.87 per share, or approximately 5.3%, to close at $15.53 per share on July 2, 2021, on unusually heavy trading volume.

8.      On Sunday, July 4, 2021, DiDi issued a press release entitled "DiDi Announces App Takedown in China[,]" which announced, in relevant part, that the CAC ordered smartphone app stores to stop offering the "DiDi Chuxing" app because the DiDi app "collect[ed] personal information in violation of relevant PRC laws and regulations."  Though users who previously downloaded the DiDi app could continue to use it, DiDi stated that "the app takedown may have an adverse impact on its revenue in China."

9.      On July 5, 2021, *The Wall Street Journal* reported that "[w]eeks before Didi Global, Inc. went public in the U.S., China's cybersecurity watchdog suggested the Chinese ride-hailing giant delay its initial public offering and urged it to conduct a thorough self-examination of its network security, according to people with knowledge of the matter."  Subsequently, *Bloomberg* and other sources reported on July 6, 2021, that the CAC had asked DiDi at least three months earlier to delay its IPO because of national security concerns.

10.     On this news, the Company's share price fell $3.04 per share, or 19.6%, to close at $12.49 per share on July 6, 2021, on unusually heavy trading volume.

11.     On July 9, 2021, *The Wall Street Journal* published an article entitled "China Orders Stores to Remove More Apps Operated by Didi: Cyber watchdog says the apps illegally collect personal data" which reported, among other things, that "China ordered mobile app stores to remove 25 more apps operated by Didi Global Inc.'s [] China arm, saying the apps illegally collect personal data, escalating its regulatory actions against the ride-hailing company"; that "[t]he cyber watchdog also banned websites and platforms from providing access to Didi-linked services in China"; that "Didi said it will follow the authorities' orders" and "guarantees personal data security"; that "[t]he latest regulatory actions could further dent Didi's business in its home market, which the company relies heavily on for revenue"; and that "[s]ome rivals have already started marketing more aggressively in recent days in an effort to steal market share."

12.     On July 12, 2021, before market hours, the Company issued a press release entitled "Didi Announces Takedown of Additional Apps in China" which announced, *inter alia*, that "the CAC stated that it was confirmed that 25 apps operated by the Company in China, including the apps used by users and drivers, had the problem of collecting personal information in serious violation of relevant PRC laws and regulations"; that "[p]ursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these apps and cease to provide viewing and downloading service in China" and required the Company to "rectify the problem to ensure the security of users' personal information"; and that "[t]he Company expects that the app takedown may have an adverse impact on its revenue in China."

13.     On this news, the Company's share price fell $0.87 per share, or approximately 7.23%, to close at $11.16 per share on July 12, 2021, further damaging investors.

14.     On July 16, 2021, *The Wall Street Journal* published an article entitled "China Sends State Security, Police Officials to Didi for Cybersecurity Probe" which reported, among other things, that "China sent regulators including state security and police officials to Didi Global Inc.'s [] ride-hailing business on Friday as part of a cybersecurity investigation"; that "[p]otential outcomes include financial penalties, suspensions of business licenses and criminal charges"; and that "[t]he large number of ministries participating in the probe also highlights the breadth of the data Didi holds and that is now coming under regulatory scrutiny."

15.     On July 18, 2021, *The Wall Street Journal* published an article entitled "In the New China, Didi's Data Becomes a Problem" which reported on the amount and types of data the Company holds and compiles, including that, among other things, "[u]sers turn over their cellphone numbers, which in China are linked to their real names and identifications"; that "[t]hey also often voluntarily share photos, frequent destinations such as home and office, their gender, age, occupation and companies"; that "[t]o use other Didi services such as carpooling or bike sharing, customers might also have to share other personal information including facial-recognition data"; that "[d]rivers must give Didi their real names, vehicle information, criminal records, and credit- and bank-card information"; that "[t]he 25 million daily rides on its platform in China feed a database of pickup points, destinations, routes, distance and duration"; and that "a Guangdong province transportation official said the company hadn't fully complied with regulations . . . ."

16.     On this news, the Company's share price fell $0.91 per share, or 7.6%, to close at $11.06 per share on July 19, 2021, further damaging investors.

17.     Finally, on July 22, 2021, before market hours, *Bloomberg* published an article entitled "China Weighs Unprecedented Penalty for Didi After U.S. IPO" which reported, *inter*

*alia*, that "Chinese regulators are considering serious, perhaps unprecedented, penalties for Didi

Global Inc. after its controversial initial public offering last month"; that "[r]egulators are weighing

a range of potential punishments, including a fine, suspension of certain operations or the

introduction of a state-owned investor"; that "[a]lso possible is a forced delisting or withdrawal of

Didi's U.S. shares"; and that "Beijing is likely to impose harsher sanctions on Didi than on Alibaba

Group Holding Ltd., which swallowed a record $2.8 billion fine[.]"

18.     On this news, the Company's share price fell $3.44 per share, or nearly 30%, over

the next two trading days to close at $8.06 per share on July 23, 2021, further damaging investors.

19.     As of the time this Complaint was filed, the price of DiDi ADSs continues to trade

below the $14.00 per ADS Offering price, damaging investors.

20.     The Registration Statement was materially false and misleading and omitted to state

material adverse facts.  Throughout the Class Period, including in the Registration Statement,

Defendants made materially false and/or misleading statements, as well as failed to disclose

material adverse facts about the Company's business, operations, and prospects.  Specifically,

Defendants failed to disclose to investors that: (i) DiDi's apps did not comply with applicable laws

and regulations governing privacy protection and the collection of personal information; (ii) the

CAC had already asked DiDi weeks or months prior to the IPO to delay its IPO to conduct a self-

examination of its network security and because of national security concerns; (iii) the Company

was likely to incur heightened regulatory scrutiny and adverse regulatory action by ignoring the

CAC's request to postpone the IPO; (iv) as a result of the foregoing, DiDi's apps were reasonably

likely to be taken down from app stores in the People's Republic of China (the "PRC" or "China"),

which would have an adverse effect on its financial results and operations; and (v) as a result of

the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

21.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

22.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

23.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).

24.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) as DiDi's ADSs trade on the New York Stock Exchange ("NYSE") in this Judicial District and many of the underwriters of DiDi's IPO have offices in this Judicia District.  The Prospectus also makes reference to the "United States District Court for the Southern District of New York" as the appropriate venue, or alternatively the state courts of New York if this Judicial District lacks jurisdiction.

25.     In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the U.S. mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

26.     Plaintiff, as set forth in the accompanying Certification, incorporated by reference herein, purchased or otherwise acquired DiDi securities pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO, and/or DiDi securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

27.     Defendant DiDi is incorporated under the laws of the Cayman Islands with its principal executive offices located in Beijing, China.  DiDi's shares trade on the NYSE under the symbol "DIDI."

28.     Defendant Will Wei Cheng ("Cheng") was, at all relevant times, the Chairman of the Board of Directors and the Chief Executive Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

29.     Defendant Alan Yue Zhuo ("Zhuo") was, at all relevant times, the Chief Financial Officer of the Company, and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

30.     Defendants Cheng and Zhuo (collectively, the "Exchange Act Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market.  The Exchange Act Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available to them, the Exchange Act

Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.  The Exchange Act Individual Defendants are liable for the false statements pleaded herein.

31.     Defendant Jean Qing Liu ("Liu") was a Director and the President of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

32.     Defendant Stephen Jingshi Zhu ("Zhu") was a Director, Senior Vice President, and Chief Executive Officer of International Business Group of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

33.     Defendant Zhiyi Chen ("Chen") was a Director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

34.     Defendant Martin Chi Ping Lau ("Lau") was a Director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

35.     Defendant Kentaro Matsui ("Matsui") was a Director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

36.     Defendant Adrian Perica ("Perica") was a Director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

37.     Defendant Daniel Yong Zhang ("Zhang") was a Director of the Company and signed or authorized the signing of the Company's Registration Statement filed with the SEC.

38.     Defendants Cheng, Zhuo, Liu, Zhu, Chen, Lau, Matsui, Perica, and Zhang are collectively referred to hereinafter as the "Individual Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

39.     DiDi purports to be the world's largest mobility technology platform.  Its four key components are: shared mobility, auto solutions, electronic mobility, and autonomous driving. The Company claims to be the "go-to brand in China for shared mobility," offering a range of services including ride hailing, taxi hailing, chauffeur, hitch, and other forms of shared mobility services.

### Materially False and Misleading Statements Issued in the Registration Statement and Prospectus

40.     On June 10, 2021, the Company filed a registration statement on Form F-1 with the SEC to register its Class A ordinary shares, which forms part of the Registration Statement.

41.     On June 24, 2021, the Company filed a registration statement on Form F-6 with the SEC to register its ADSs, which forms part of the Registration Statement.

42.     On June 24, 2021, the Company filed Amendment No. 1 to the Registration Statement with the SEC on Form F-1A, which forms part of the Registration Statement.

43.     On June 28, 2021, the Company filed Amendment No. 2 to the Registration Statement with the SEC on Form F-1A, which forms part of the Registration Statement.

44.     On June 29, 2021, the Company filed a Form F-1MEF, which forms part of the Registration Statement.  The Registration Statement was declared effective the same day.

45.     On June 30, 2021, the Company filed its Prospectus on Form 424B4 with the SEC, which forms part of the Registration Statement.  As stated above in ¶ 4, in the IPO, the Company sold approximately 316,800,000 shares at a price of $14.00 per share, not including the underwriters' option.  Four ADSs represent one Class A ordinary share.  The Company estimated it would receive net proceeds of approximately $4.3 billion from the Offering (or $4.98 billion if

the underwriters exercised their option to purchase additional ADSs in full) after deducting the underwriting discounts, commissions and estimated Offering expenses.  The proceeds from the IPO were purportedly to be used to invest in the Company's technology capabilities, grow its presence in certain international markets outside of China, introduce new products and expand existing offerings, and general corporate purposes.

46.    The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading, and was not prepared in accordance with the rules and regulations governing its preparation.

47.    Under applicable SEC rules and regulations, the Registration Statement was required to disclose known trends, events or uncertainties that were having, and were reasonably likely to have, an impact on the Company's continuing operations.

48.    The Registration Statement acknowledged that DiDi is "subject to numerous laws and regulations that address privacy, data protection and the collection, storing, sharing, use, disclosure and protection of certain types of data in various jurisdictions . . . including the Data Security Law promulgated by the Standing Committee of the National People's Congress of China in June 2021, which will take effect in September 2021" and purported to warn of the risks of failure to comply with regulation enacted by the PRC government in the areas of Internet Security and Privacy Protection, although these risks had already materialized and the CAC had already asked DiDi to postpone the IPO.  Specifically, the Registration Statement represented as follows:

**Regulation Relating to Internet Security**

The PRC government has enacted various laws and regulations with respect to internet security and protection of personal information from any inappropriate collection activities, abuse or unauthorized disclosure. Internet information in the PRC is regulated and restricted from a national security standpoint . . . .

According to the Cybersecurity Law and other related laws and regulations, internet service providers are required to take measures to ensure internet security by complying with security protection obligations, formulating cybersecurity emergency response plans, and providing technical assistance and support for public security and national security authorities. In addition, any collection, process and use of a user's personal information must be subject to the consent of the user, be legal, rational and necessary, and be limited to specified purposes, methods and scopes. An internet service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or providing such information to other parties illegally.

***Failure to comply with the above laws and regulations may subject the internet service providers to administrative penalties including, without limitation, fines, suspension of business operation, shut-down of the websites, revocation of licenses and even criminal liabilities.***

On June 10, 2021, the Standing Committee of the National People's Congress of China promulgated the Data Security Law, which will take effect in September 2021. The Data Security Law provides for data security and privacy obligations on entities and individuals carrying out data activities . . . . As the Data Security Law was recently promulgated and has not yet taken effect, ***we may be required to make further adjustments to our business practices to comply with this law***.

**Regulations Relating to Privacy Protection**

In recent years, PRC government authorities have enacted laws and regulations on internet use to protect personal information from any unauthorized disclosure. The Cyber Security Law imposes certain data protection obligations on network operators, including that network operators may not disclose, tamper with, or damage users' personal information that they have collected, or provide users' personal information to others without consent. Exempted from these rules is information irreversibly processed to preclude identification of specific individuals. Moreover, network operators are obligated to delete unlawfully collected information and to amend incorrect information.

The Several Provisions on Regulating the Market Order of Internet Information Services, issued by the MIIT on December 29, 2011 and effective on March 15, 2012, stipulate that internet information service providers may not collect any user personal information or provide any such information to third parties without the consent of a user, unless otherwise stipulated by laws and administrative regulations. "User Personal information" is defined as information relevant to the users that can lead to the recognition of the identity of the users independently or in combination with other information. An internet information service provider must expressly inform the users of the method, content and purpose of the collection and processing of such user personal information and may only collect

such information as necessary for the provision of its services. An internet information service provider is also required to properly store user personal information, and in case of any leak or likely leak of the user personal information, the internet information service provider must take immediate remedial measures and, in severe circumstances, make an immediate report to the telecommunications regulatory authority.

The Decision on Strengthening the Protection of Online Information, issued by the Standing Committee of the National People's Congress on December 28, 2012, and the Order for the Protection of Telecommunication and Internet User Personal Information, issued by the MIIT on July 16, 2013, stipulate that any collection and use of user personal information must be subject to the consent of the user, abide by the principles of legality, rationality and necessity and be within the specified purposes, methods and scope. An internet information service provider must also keep such information strictly confidential, and is further prohibited from divulging, tampering with or destroying any such information, or selling or proving such information to other parties. An internet information service provider is required to take technical and other measures to prevent the collected personal information from any unauthorized disclosure, damage or loss. ***Any violation of the above decision or order may subject the internet information service provider to warnings, fines, confiscation of illegal gains, revocation of licenses, cancelation of filings, closedown of websites or even criminal liabilities.***

With respect to the security of information collected and used by mobile apps, pursuant to the Announcement of Conducting Special Supervision against the Illegal Collection and Use of Personal Information by Apps, which was issued by the [CAC], the MIIT, the Ministry of Public Security, and the State Administration for Market Regulation on January 23, 2019, ***app operators shall collect and use personal information in compliance with the Cyber Security Law and shall be responsible for the security of personal information obtained from users and take effective measures to strengthen personal information protection***. Furthermore, app operators shall not force their users to make authorization by means of default settings, bundling, suspending installation or use of the app or other similar means and shall not collect personal information in violation of laws, regulations or breach of user agreements. Such regulatory requirements were emphasized by the Notice on the Special Rectification of Apps Infringing upon User's Personal Rights and Interests, which was issued by MIIT on October 31, 2019. On November 28, 2019, the [CAC], the MIIT, the Ministry of Public Security and the State Administration for Market Regulation jointly issued the Methods of Identifying Illegal Acts of Apps to Collect and Use Personal Information. This regulation further illustrates certain commonly seen illegal practices of app operators in terms of personal information protection and specifies acts of app operators that will be considered as "collection and use of personal information without users' consen.t [*sic*]"

On May 28, 2020, the National People's Congress adopted the Civil Code, which came into effect on January 1, 2021. Pursuant to the Civil Code, the personal

information of a natural person shall be protected by the law. Any organization or individual shall legally obtain such personal information of others when necessary and ensure the safety of such information, and shall not illegally collect, use, process or transmit personal information of others, or illegally purchase or sell, provide or disclose personal information of others.

(Emphases in bold and italics added.)

49.     The Registration Statement's generic disclosures about China's internet security regulations contrasted with the Company's specific disclosures regarding the risks of relevant Chinese authorities' anti-trust and anti-monopoly investigations.   The Registration Statement stated, in pertinent part, the following regarding relevant regulations, discussions, investigations, and proceedings:

**LEGAL PROCEEDINGS**

We are regularly subject to various types of legal proceedings by drivers, consumers, employees, commercial partners, competitors, and government agencies, among others, as well as investigations and other administrative or regulatory proceedings by government agencies. In the ordinary course of our business, various parties claim that we are liable for damages related to accidents or other incidents involving drivers, consumers or other third parties on our platform. We are also subject to contractual disputes with drivers and other third parties. We are currently named as a defendant in a number of matters related to accidents or other incidents involving drivers, consumers and other third parties, and in matters related to contract disputes. Furthermore, we are involved in disputes with third parties asserting, among other things, alleged infringement of their intellectual property rights.

***There is no pending or threatened legal proceeding that individually, in our opinion, is likely to have a material impact on our business, financial condition or results of operations.*** However, results of litigation and claims are inherently unpredictable and legal proceedings related to such accidents or incidents could, in the aggregate, have a material impact on our business, financial condition and results of operations. Regardless of the outcome, litigation can have an adverse impact on us because of defense and settlement costs individually and in the aggregate, diversion of management resources and other factors.

(Emphasis in bold and italics added.)

50.     Rather than disclose known discussions into the Company's practices and non-compliance with relevant laws, the Registration Statement provided boilerplate risk warnings about potential contingent future issues that may occur.  While these risk statements acknowledged the material importance to investors of China's regulatory regime and potential investigations in into the Company, these statements neglected to warn investors of the ongoing technology-based issues, investigations, and discussions concerning the Company.  For example, as to data privacy, the Registration Statement disclosed the following risks, in relevant part, that ***could*** affect the Company:

> Our business is subject to a variety of laws, regulations, rules, policies and other obligations regarding privacy, data protection and information security. Any losses, unauthorized access or releases of confidential information or personal data could subject us to significant reputational, financial, legal and operational consequences.

> We receive, transmit and store a large volume of personally identifiable information and other data on our platform. We are subject to numerous laws and regulations that address privacy, data protection and the collection, storing, sharing, use, disclosure and protection of certain types of data in various jurisdictions. See "Regulation" for laws, rules and regulations applicable to us, including the Data Security Law promulgated by the Standing Committee of the National People's Congress of China in June 2021, which will take effect in September 2021. Interpretation, application and enforcement of these laws, rules and regulations evolve from time to time and their scope may continually change, through new legislation, amendments to existing legislation and changes in enforcement. We have incurred, and will continue to incur, significant expenses in an effort to comply with privacy, data protection and information security standards and protocols imposed by law, regulation, industry standards or contractual obligations. Changes in existing laws or regulations or adoption of new laws and regulations relating to privacy, data protection and information security, particularly any new or modified laws or regulations that require enhanced protection of certain types of data or new obligations with regard to data retention, transfer or disclosure, could greatly increase the cost to us of providing our service offerings, require significant changes to our operations or even prevent us from providing certain service offerings in jurisdictions in which we currently operate or in which we may operate in the future.

> Despite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection and information security, ***it is possible that our practices, offerings or platform could fail to meet all of the***

*requirements imposed on us by such laws, regulations or obligations. Any failure on our part to comply with applicable laws or regulations* or any other obligations relating to privacy, data protection or information security, or any compromise of security that results in unauthorized access, use or release of personally identifiable information or other data, or the perception or allegation that any of the foregoing types of failure or compromise has occurred, could damage our reputation, discourage new and existing drivers and riders from using our platform or *result in investigations, fines, suspension of one or more of our apps, or other penalties by government authorities and private claims or litigation, any of which could materially adversely affect our business, financial condition and results of operations*. Even if our practices are not subject to legal challenge, the perception of privacy concerns, whether or not valid, may harm our reputation and brand and adversely affect our business, financial condition and results of operations.

*Maintaining and enhancing our brand and reputation is critical to our business prospects.* We were subject to negative publicity in the past, and failure to maintain our brand and reputation will cause our business to suffer.

*Maintaining and enhancing our brand and reputation is critical* to our ability to attract new consumers, drivers and partners to our platform, to preserve and deepen the engagement of our existing consumers, drivers and partners and *to mitigate legislative or regulatory scrutiny, litigation, government investigations and adverse public sentiment*. Negative publicity, whether or not justified, can spread rapidly through social media. To the extent that we are unable to respond timely and appropriately to negative publicity, our reputation and brand can be harmed . . . .

(Emphases added.)

51.     Regarding regulatory oversight, the Registration Statement stated that, in April 2021, the Company had participated in a meeting with Chinese regulators regarding compliance with antimonopoly, anti-unfair competition, tax, and other related laws.  Following the meeting, the Company conducted a self-inspection as to certain issues, but the Registration Statement stated that DiDi "cannot assure you that the regulatory authorities will be satisfied with our self-inspection results or that we will not be subject to any penalty with respect to . . . privacy protection . . . ."  Specifically, it stated:

For example, in April 2021, the State Administration for Market Regulation, together with the Cyberspace Administration and the State Administration of Taxation, held a meeting with more than 30 major internet companies in China,

including us. All companies that participated in the meeting were required to conduct a self-inspection within one month to identify and correct possible violations of anti-monopoly, anti-unfair competition, tax and other related laws and regulations and submit their compliance commitments for public supervision. As of the date of this prospectus, we have completed the self-inspection and the relevant governmental authorities have conducted onsite inspections of our company. *Our self-inspection uncovered a number of areas which could be deemed problematic from the compliance perspective, including potential anticompetitive practices in certain ancillary services such as electric vehicle charging, disclosure of driver income and related policies, inaccurate marketing and promotional materials, potentially unfair pricing in the community group buying business* which has ceased to be our consolidated subsidiary since March 31, 2021, and failure to make filings of certain transactions subject to merger control review. We have made efforts to correct or improve the above areas to ensure compliance to the extent we can. However, *we cannot assure you that the regulatory authorities will be satisfied with our self-inspection results or that we will not be subject to any penalty with respect to any violations* of anti-monopoly, anti-unfair competition, pricing, advertisement, *privacy protection*, food safety, product quality, tax and other related laws and regulations. We expect that these areas will receive greater and continued attention and scrutiny from regulators and the general public going forward. As a result, we may be subject to additional inspections and/or investigations and may incur additional costs and expenses, devote more of our management's attention and allocate additional resources to comply with the relevant laws and regulations and other requirements of relevant government authorities.

(Emphases added.)

52.    The Registration Statement emphasized that DiDi relied on the market in China for its operations.  It stated that "China is the best starting place for realizing [DiDi's] vision for mobility" and that "China's mobility market is expected to reach US$3.9 trillion by 2040, by which time the penetration of shared mobility and electric vehicles is expected to have increased to 35.9% and 50.2%, respectively . . . ."

53.    The Registration Statement also stated that "[i]n 2020, the number of ride hailing transactions from our top five cities in China constituted approximately 20% of our total China ride hailing transactions."  Therefore, "any changes to local laws or regulations within these cities

that affect [the Company's] ability to operate or increase [its] operating expenses in these markets would have an adverse effect on our business."

54.    Moreover, the Registration Statement stated that the Company purportedly "follow[ed] strict procedures in collecting, transmitting, storing and using user data pursuant to [its] data security and privacy policies."  In fact, the Registration Statement represented that DiDi "collect[s] personal information and other data from [its] users and use such data in the course of [its] operations only with their prior consent."

55.    The Registration Statement for the IPO was issued with materially false facts and omitted to state other facts necessary to make the statements made not misleading.  Specifically, the Registration Statement was materially false and misleading and omitted to inform investors that: (i) DiDi's apps did not comply with applicable laws and regulations governing privacy protection and the collection of personal information; (ii) the CAC had asked DiDi months or weeks prior to the IPO to delay its IPO to conduct a self-examination of its network security and because of national security concerns; (iii) the Company was likely to incur heightened regulatory scrutiny and adverse regulatory action by ignoring the CAC's request to postpone the IPO; (iv) as a result of the foregoing, DiDi's apps were reasonably likely to be taken down from app stores in China, which would have an adverse effect on its financial results and operations; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**Materially False and Misleading Statements Issued During the Class Period**

56.    The Class Period begins on June 30, 2021.  On that day, the Company filed its Prospectus, which contained the statements referenced in ¶¶ 48-54.

57.     The above statements identified in ¶ 56 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects to the extent that the statements emphasized the importance of the Chinese market and purported to warn investors that the regulatory authorities "could" find the Company to be out of compliance with laws and regulations or might not be satisfied with the Company's self-inspection results, which in turn could result in the suspension of operations or other penalties that could materially adversely affect DiDi's business.   Specifically, Defendants failed to disclose to investors that: (i) DiDi's apps did not comply with applicable laws and regulations governing privacy protection and the collection of personal information; (ii) the CAC had already asked DiDi weeks or months prior to the IPO to delay its IPO to conduct a self-examination of its network security and because of national security concerns; (iii) the Company was likely to incur heightened regulatory scrutiny and adverse regulatory action by ignoring the CAC's request to postpone the IPO; (iv) as a result of the foregoing, DiDi's apps were reasonably likely to be taken down from app stores in China, which would have an adverse effect on its financial results and operations; and (v) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**The Truth Begins to Emerge**

58.     On July 2, 2021, the CAC stated that it had launched an investigation into DiDi to protect national security and the public interest.

59.     On this news, the Company's share price fell $0.87 per share, or approximately 5.3%, to close at $15.53 per share on July 2, 2021, on unusually heavy trading volume.

60.     Also on July 2, 2021, DiDi issued a press release that stated:

DiDi . . . the world's leading mobility technology platform, today announced that pursuant to the announcement posted by the PRC's Cyberspace Administration Office on July 2, 2021, DiDi is subject to cybersecurity review by the authority. During the review, DiDi is required to suspend new user registration in China.

DiDi will fully cooperate with the PRC government authority during the review. It plans to conduct a comprehensive examination of cybersecurity risks and continue to improve on its cybersecurity systems and technology capabilities.

Apart from the suspension of new user registration in China, DiDi maintains normal operation.

61.    The above statements identified in ¶ 60 were materially false and/or misleading, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, Defendants failed to disclose to investors that: (i) DiDi's apps did not comply with applicable laws and regulations governing privacy protection and the collection of personal information; (ii) the CAC had already asked DiDi weeks or months prior to the IPO to delay its IPO to conduct a self-examination of its network security and because of national security concerns; (iii) as a result of the foregoing, DiDi's apps were reasonably likely to be taken down from app stores in China, which would have an adverse effect on its financial results and operations; and (iv) as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

62.    On Sunday, July 4, 2021, DiDi issued a press release announcing that the CAC ordered smartphone app stores to stop offering the "DiDi Chuxing" app because it "collect[ed] personal information in violation of relevant PRC laws and regulations."  The Company was ordered to make changes to comply with Chinese data protection rules to "ensure the safety of the personal information of users."  DiDi stated that it "will strive to rectify any problems, improve its risk prevention awareness and technological capabilities, protect users' privacy and data security,

and continue to provide secure and convenient services to its users." Though users who previously downloaded the app could continue to use it, DiDi stated that "the app takedown may have an adverse impact on its revenue in China."

63.    On July 5, 2021, *The Wall Street Journal* reported that the CAC had asked the Company weeks prior to the IPO to postpone the Offering because of national security concerns and to "conduct a thorough self-examination of its network security."  Subsequently, *Bloomberg* and other sources reported on July 6, 2021, that the CAC had asked DiDi at least three months earlier to delay its IPO because of national security concerns.

64.    On this news, the Company's share price fell $3.04 per share, or 19.6%, to close at $12.49 per share on July 6, 2021, on unusually heavy trading volume.

65.    On July 9, 2021, *The Wall Street Journal* published an article entitled "China Orders Stores to Remove More Apps Operated by Didi: Cyber watchdog says the apps illegally collect personal data" which reported, in relevant part:

> ***China ordered mobile app stores to remove 25 more apps operated by Didi Global Inc.'s [] China arm, saying the apps illegally collect personal data***, escalating its regulatory actions against the ride-hailing company.
>
> The apps newly targeted on Friday include Didi's app for drivers offering rides through its platform, an app for corporate users and a financing app . . . .
>
> ***The cyber watchdog also banned websites and platforms from providing access to Didi-linked services in China***, according to the watchdog's statement.
>
> *        *        *
>
> ***Didi said it will follow the authorities' orders. In a statement it posted on social media platform Weibo, the company also said it guarantees personal data security . . . .***
>
> Users of Didi's main app in China are able to hail rides, rent bikes and even buy groceries. Other apps operated by Didi are linked to, or supplement, services offered on the main app. The apps that regulators targeted Friday include those for

drivers providing rides through Didi and types for specific users such as corporate customers or the elderly.

> **The latest regulatory actions could further dent Didi's business in its home market, which the company relies heavily on for revenue** even as it expands into overseas markets . . . .

> **Some rivals have already started marketing more aggressively in recent days in an effort to steal market share. Didi's Chinese market share is around 80% to 90%**, according to Cherry Leung, an analyst at Sanford C. Bernstein in Hong Kong.

(Emphases added.)

66.     On July 12, 2021, before market hours, the Company issued a press release entitled

"Didi Announces Takedown of Additional Apps in China" which announced, in relevant part:

> According to the announcement posted by the [CAC] on July 9, 2021, **the CAC stated that it was confirmed that 25 apps operated by the Company in China, including the apps used by users and drivers, had the problem of collecting personal information in serious violation of relevant PRC laws and regulations. Pursuant to the PRC's Cybersecurity Law, the CAC notified app stores to take down these apps and cease to provide viewing and downloading service in China**, and required the Company to strictly comply with relevant laws and regulations, follow the relevant standards set by the PRC government authorities, and **rectify the problem to ensure the security of users' personal information. The Company expects that the app takedown may have an adverse impact on its revenue in China.**

67.     On this news, the Company's share price fell $0.87 per share, or approximately

7.23%, to close at $11.16 per share on July 12, 2021, further damaging investors.

68.     On July 16, 2021, *The Wall Street Journal* published an article entitled "China

Sends State Security, Police Officials to Didi for Cybersecurity Probe" which reported, in relevant

part:

> China sent regulators including state security and police officials to Didi Global Inc.'s [] ride-hailing business on Friday as part of a cybersecurity investigation, the latest development in a regulatory saga that has gripped China's tech industry.

> Regulators from government units including the Ministry of Public Security, the Ministry of State Security, the [CAC], the Ministry of Transport and Ministry of

Natural Resources will be stationed at Didi starting Friday for the investigation, the cyberspace administration said in an online statement.

The [CAC], the country's internet regulator, earlier this month ordered Didi to undergo a cybersecurity review over national-security concerns, days after the company raised $4.4 billion in a New York initial public offering. The regulator also said Didi illegally collected personal data and ordered more than two dozen of its apps removed from app stores.

The Ministry of Public Security is in charge of China's domestic security, while the Ministry of State Security oversees the country's civilian arm for intelligence gathering and counterespionage . . . .

*Still, their participation signals the potentially serious nature of the investigation. Potential outcomes include financial penalties, suspensions of business licenses and criminal charges.*

*The large number of ministries participating in the probe also highlights the breadth of the data Didi holds and that is now coming under regulatory scrutiny.* The Transport Ministry regulates the ride-hailing industry, while the Ministry of Natural Resources is in charge of mapping and road surveying.

(Emphases added.)

69. On July 18, 2021, *The Wall Street Journal* published an article entitled "In the New China, Didi's Data Becomes a Problem" which reported the following, in relevant part, regarding the amount and types of data the Company holds and compiles:

*Bolstered by its wide swath of data on users, mapping and traffic, Didi Global Inc. became the dominant ride-hailing company in China. Now, that data is turning into a liability . . . .*

[Chinese state-security, police officials, and other regulators'] target is a company with 377 million annual active users and 13 million annual active drivers in China. *Users turn over their cellphone numbers, which in China are linked to their real names and identifications. They also often voluntarily share photos, frequent destinations such as home and office, their gender, age, occupation and companies. To use other Didi services such as carpooling or bike sharing, customers might also have to share other personal information including facial-recognition data.*

*Drivers must give Didi their real names, vehicle information, criminal records, and credit- and bank-card information.*

The company in securities filings touts its repository of real-world traffic data as the world's largest. *The 25 million daily rides on its platform in China feed a database of pickup points, destinations, routes, distance and duration. In-car cameras and voice recorders capture conversations.*

*Adding to the sensitivity, the company in 2017 won a government license to produce high-precision maps, a sector shut to foreign companies for national-security reasons.* It is a rare privilege—only 29 Chinese entities are licensed to do detailed surveying and mapping, according to data compiled by researcher IDC and government statements. That, combined with Didi's real-time location data, could raise national-security concerns, analysts and lawyers said.

"Mapping points to potentially sensitive areas such as Chinese defense zones, and this can be a treasure trove of information for hostile actors," said Carly Ramsey, a Shanghai-based director at consulting firm Control Risks Group . . . .

The company has said it stores all its domestic user data in China. In addition to ride hailing and bike sharing, the company operates financial services, a group-buying grocery business, and a van-hailing service for moving or carrying large items.

*A 2015 collaboration between Didi and a unit of China's state-run Xinhua News Agency provided startling visibility into what this data could reveal about the government.* The project analyzed rides to or from various government departments, including 1,327 trips in 24 hours to or from the Ministry of Public Security, China's police. The article gave a detailed hourly breakdown of the arrivals and departures, then cross-referenced them to investigations in the news to speculate about what cases might have been keeping officers busy.

*Xinhua and Didi also compared rides to and from about 20 other ministries and government departments.* The data showed 298 rides left the now-dissolved Ministry of Land and Resources between the hours of 6 p.m. and 2 a.m. in the two days the study was conducted, leading the authors to conclude the ministry had the "most ruthless" overtime hours.

* * *

*In 2017, state-run CCTV ran an exposé showing how a consumer's Didi user records, including pickup and drop-off locations and timings, could be purchased on the black market for the equivalent of around $8.50 for a page of data.*

* * *

In March, a Didi executive speaking at a "smart transportation" conference in Nanjing, in eastern China, said the company could be a valuable partner to the Transport Ministry, according to material posted on the event organizer's website.

Didi cars travel Beijing streets hundreds of times every day, if not more, and the data gathered gives an accurate picture of the city's traffic conditions, said Ding Neng, a vice president at the company. *The in-car cameras Didi has installed in more than 300 Chinese cities also constantly record video from inside and outside the vehicle, Mr. Ding told attendees.*

*In Shenzhen, Didi built a big data transportation management platform with the local transportation regulator. The company also helped install hundreds of smart traffic signals in Wuhan, Jinan and other cities to ease congestion by crunching data from its ride-hailing operations, including routes and speeds.*

However, the company has resisted sharing certain data with regulators. In 2018, after two incidents of female passengers killed by Didi drivers, *a Guangdong province transportation official said the company hadn't fully complied with regulations* that required it to send real-time data on vehicle routes and driver information to a supervising platform run by authorities.

(Emphases added.)

70.     On this news, the Company's share price fell $0.91 per share, or 7.6%, to close at

$11.06 per share on July 19, 2021, further damaging investors.

### The Truth Fully Emerges

71.     On July 22, 2021, before market hours, *Bloomberg* published an article entitled

"China Weighs Unprecedented Penalty for Didi After U.S. IPO" which reported, in relevant part,

the following:

*Chinese regulators are considering serious, perhaps unprecedented, penalties for Didi Global Inc. after its controversial initial public offering last month*, according to people familiar with the matter.

Regulators see the ride-hailing giant's decision to go public despite pushback from the [CAC] as a challenge to Beijing's authority, the people said, asking not to be named because the matter is private . . . .

*Regulators are weighing a range of potential punishments, including a fine, suspension of certain operations or the introduction of a state-owned investor, the people said. Also possible is a forced delisting or withdrawal of Didi's U.S. shares, although it's unclear how such an option would play out . . . .*

*Beijing is likely to impose harsher sanctions on Didi than on Alibaba Group Holding Ltd., which swallowed a record $2.8 billion fine* after a months-long

25

antitrust investigation and agreed to initiate measures to protect merchants and customers, the people said.

\* \* \*

China's regulators largely supported the idea of an IPO, but **they expressed concerns about Didi's data security practices since at least April**, the people said. **In one example of concern, Didi had disclosed statistics on taxi trips taken by government officials**, one of the people said, although it's not clear whether that specific issue was raised with the company.

**Regulators urged Didi to ensure the security of its data before proceeding with the IPO or to shift the location to Hong Kong or mainland China** where disclosure risks would be lower, the people said. Regulators didn't explicitly forbid the company from going public in the U.S., but **they felt certain Didi understood the official instructions**, they said.

One person involved in the meetings, when asked why Didi didn't act on suggestions from regulators, referred to a proverb that you can't wake a person pretending to sleep.

\* \* \*

Some regulatory officials expressed in private that they think Didi may have rushed its IPO out before China unveiled a new web security law, which could have hurt its valuation, one of the people said. Just days after the offering, China proposed new rules that would require nearly all companies seeking to list in foreign countries to undergo a CAC cybersecurity review.

\* \* \*

By March, they had homed in on the U.S. because the listing rules were more amenable and the company expected a better valuation from investors familiar with its American counterpart, Uber Technologies Inc. **The Hong Kong exchange also questioned Didi's compliance with Chinese regulations. It didn't have licenses to operate in certain cities and many of its drivers lacked a household registration, or hukou, for the cities where they lived, part of municipal requirements for providing on-demand ride-hailing services there.**

\* \* \*

**Cheng, President Jean Liu, investors and their bankers faced the choice of erring on the side of caution or proceeding with an offering that would fill the company's coffers and enrich all of them. On June 28, they gave the green light.**

(Emphases added.)

26

72.     On this news, the Company's share price fell $3.44 per share, or nearly 30%, over the next two trading days to close at $8.06 per share on July 23, 2021, further damaging investors.

73.     As of the time this Complaint was filed, the price of DiDi ADSs continues to trade below the $14.00 per ADS Offering price, damaging investors.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

74.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class, consisting of all persons and entities that purchased or otherwise acquired publicly traded DiDi securities: (a) pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO; and/or (b) during the Class Period; and who were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

75.     The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DiDi's shares actively traded on the NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds or thousands of members in the proposed Class.  Millions of DiDi shares were traded publicly during the Class Period on the NYSE.  Record owners and other members of the Class may be identified from records maintained by DiDi or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

76.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

77.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

78.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

a.      whether the federal securities laws were violated by Defendants' acts as alleged herein;

b.      whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of DiDi; and

c.      to what extent the members of the Class have sustained damages and the proper measure of damages.

79.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

80.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

81.     During the Class Period, Plaintiff and the Class purchased DiDi's securities at artificially inflated prices and were damaged thereby.  The price of the Company's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.

## SCIENTER ALLEGATIONS

82.     As alleged herein, with respect to claims under the Exchange Act, DiDi and the Exchange Act Individual Defendants acted with scienter because they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, DiDi and the Exchange Act Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding DiDi, their control over, and/or receipt and/or modification of DiDi's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning DiDi, participated in the fraudulent scheme alleged herein.

83.     DiDi and the Exchange Act Individual Defendants knew or recklessly disregarded the falsity and misleading nature of the information which they caused to be disseminated to the investing public.  The ongoing fraudulent scheme described in this Complaint could not have been perpetrated without the knowledge and complicity of the personnel at the highest level of the Company, including the Exchange Act Individual Defendants.  Defendants had the motive and opportunity to perpetrate the fraudulent scheme and course of business described herein because

the Exchange Act Individual Defendants were the most senior offices of DiDi, issued statements and press releases on behalf of DiDi, and had the opportunity to commit the fraud alleged herein. Further, the Exchange Act Individual Defendants were motivated to commit the fraud alleged to complete the IPO with shares at an inflated price and to maintain shares at inflated prices during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

84.     The market for DiDi's securities was open, well-developed and efficient at all relevant times.  As a result of the materially false and/or misleading statements and/or failures to disclose, DiDi's securities traded at artificially inflated prices during the Class Period.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of DiDi's securities and market information relating to DiDi, and have been damaged thereby.

85.     During the Class Period, the artificial inflation of DiDi's shares was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about DiDi's business, prospects, and operations.  These material misstatements and/or omissions created an unrealistically positive assessment of DiDi and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company's shares. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

86.     At all relevant times, the market for DiDi's securities was an efficient market for the following reasons, among others:

        a.      DiDi shares met the requirements for listing, and were listed and actively traded on the NYSE, a highly efficient and automated market;

        b.      As a regulated issuer, DiDi filed periodic public reports with the SEC and/or the NYSE;

        c.      DiDi was covered regularly by securities analysts; and

        d.      DiDi regularly issued press releases which were carried by national news wires.  Each of these releases was publicly available and entered the public marketplace.

87.     As a result of the foregoing, the market for DiDi's securities promptly digested current information regarding DiDi from all publicly available sources and reflected such information in DiDi's share price.  Under these circumstances, all purchasers of DiDi's securities during the Class Period suffered similar injury through their purchase of DiDi's securities at artificially inflated prices and a presumption of reliance applies.

88.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## **NO SAFE HARBOR**

89.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then existing facts and

conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of DiDi who knew that the statement was false when made.

## COUNT I

### (Violations of Section 11 of the Securities Act Against All Defendants)

90.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

91.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Defendants.

92.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

93.     DiDi is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

94.     As issuer of the shares, DiDi is strictly liable to Plaintiff and to the members of the Class who purchased the Company's shares pursuant and/or traceable to the Registration

Statement for the IPO which contained the materially untrue statements and omissions alleged herein.

95.     None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

96.     The Individual Defendants were officers and/or directors of DiDi and signed the Registration Statement or authorized it to be signed on their behalf and were responsible for the contents and dissemination of the Registration Statement.

97.     By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

98.     Plaintiff acquired DiDi shares pursuant and/or traceable to the Registration Statement for the IPO.

99.     Plaintiff and the Class have sustained damages.  The value of DiDi shares has declined substantially subsequent to and due to the Defendants' violations.

### <u>COUNT II</u>

**(Violations of Section 15 of the Securities Act Against the Individual Defendants)**

100.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein, except any allegation of fraud, recklessness, or intentional misconduct.

101.     This Count is asserted against the Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o, on behalf of the Class, against the Individual Defendants.

102.     The Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of DiDi

within the meaning of Section 15 of the Securities Act.  The Individual Defendants had the power

and influence and exercised the same to cause DiDi to engage in the acts described herein.

103.    The Individual Defendants' positions made them privy to and provided them with

actual knowledge of the material facts concealed from Plaintiff and the Class.

104.    By virtue of the conduct alleged herein, the Individual Defendants are liable for the

aforesaid wrongful conduct and are liable to Plaintiff and the Class for damages suffered.

## COUNT III

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5  Promulgated Thereunder Against DiDi and the Exchange Act Individual Defendants)**

105.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully

set forth herein.

106.    During the Class Period, DiDi and the Exchange Act Individual Defendants carried

out a plan, scheme and course of conduct which was intended to and, throughout the Class Period,

did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein;

and (ii) cause Plaintiff and other members of the Class to purchase DiDi's securities at artificially

inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, DiDi and the

Exchange Act Individual Defendants, and each defendant, took the actions set forth herein.

107.    DiDi and the Exchange Act Individual Defendants (i) employed devices, schemes,

and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material

facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a

course of business which operated as a fraud and deceit upon the purchasers of the Company's

securities in an effort to maintain artificially high market prices for DiDi's securities in violation

of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. DiDi and the

Exchange Act Individual Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

108.    DiDi and the Exchange Act Individual Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about DiDi's financial well-being and prospects, as specified herein.

109.    DiDi and the Exchange Act Individual Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of DiDi's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about DiDi and its business operations and future prospects in light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

110.    Each of DiDi's and the Exchange Act Individual Defendants' primary liability and controlling person liability arises from the following facts: (i) the Exchange Act Individual Defendants were high-level executives and/or directors at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) each of these defendants, by virtue of their responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; (iii) each of these defendants

enjoyed significant personal contact and familiarity with the other defendants and was advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (iv) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

111.    DiDi and the Exchange Act Individual Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing DiDi's financial well-being and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by DiDi and the Exchange Act Individual Defendants' overstatements and/or misstatements of the Company's business, operations, financial wellbeing, and prospects throughout the Class Period, DiDi and the Exchange Act Individual Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

112.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of DiDi's securities was artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by DiDi and the Exchange Act Individual Defendants,

or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by DiDi and the Exchange Act Individual Defendants, but not disclosed in public statements by DiDi and the Exchange Act Individual Defendants during the Class Period, Plaintiff and the other members of the Class acquired DiDi's securities during the Class Period at artificially high prices and were damaged thereby.

113.     At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding the problems that DiDi was experiencing, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their DiDi securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

114.     By virtue of the foregoing, DiDi and the Exchange Act Individual Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

115.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## **COUNT IV**

### **(Violations of Section 20(a) of the Exchange Act Against the Exchange Act Individual Defendants)**

116.     Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

117.   The Exchange Act Individual Defendants acted as controlling persons of DiDi within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions and their ownership and contractual rights, participation in, and/or awareness of the Company's operations and intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Exchange Act Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.   The Exchange Act Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

118.   In particular, the Exchange Act Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

119.   As set forth above, DiDi and the Exchange Act Individual Defendants each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder by their acts and omissions as alleged in this Complaint.  By virtue of their position as controlling persons, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of DiDi's and the Exchange Act Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.       Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

B.       Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.       Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.       Such other and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  August  4, 2021

Respectfully submitted,

POMERANTZ LLP

*/s/ Jeremy A. Lieberman*
Jeremy A. Lieberman
J. Alexander Hood II
James M. LoPiano
600 Third Avenue
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (212) 661-8665
jalieberman@pomlaw.com
ahood@pomlaw.com
jlopiano@pomlaw.com

*Attorneys for Plaintiff*

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.      I, Michal Kucharski, make this declaration pursuant to Section 27(a)(2) of the Securities Act of 1933 (the "Securities Act") and/or Section 21D(a)(2) of the Securities Exchange Act of 1934 (the "Exchange Act") as amended by the Private Securities Litigation Reform Act of 1995.

2.      I have reviewed a Complaint against DiDi Global Inc. f/k/a Xiaoju Kuaizhi Inc. ("DiDi" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.      I did not purchase or acquire DiDi securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the Securities Act or the Exchange Act.

4.      I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired publicly traded DiDi securities: (a) pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO as specified in the Complaint; and/or (b) during the Class Period as specified in the Complaint; including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.      The attached sheet lists all of my transactions in publicly traded DiDi securities: (a) pursuant and/or traceable to the Registration Statement issued in connection with the Company's IPO as specified in the Complaint; and/or (b) during the Class Period as specified in the Complaint.

6.      During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.      I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my pro rata share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.    I declare under penalty of perjury that the foregoing is true and correct.


Executed    31/07/2021
                 **(Date)**


                                              _(Signature)_

                                    **(Signature)**

                                    **Michal Kucharski**

**DiDi Global Inc. (DIDI)**                                          **Kucharski, Michal**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 7/1/2021 | 135 | $15.6300 |
| Purchase | 7/1/2021 | 104 | $15.9800 |
| Sale | 7/6/2021 | (238) | $11.5900 |